**Opinion filed October 17, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00353-CR

_____

## EDWARD BRICENO, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 441st District Court**

**Midland County, Texas**

**Trial Court Cause No. CR44878**

## M E M O R A N D U M   O P I N I O N

A jury convicted Appellant, Edward Briceno, of murder, a first-degree felony. TEX. PENAL CODE ANN. § 19.02(b)(1), (c) (West Supp. 2024). After rejecting a sudden passion defense and finding an enhancement paragraph to be true, the trial court sentenced Appellant to life imprisonment. In five issues on appeal, Appellant argues that: (1) the evidence was insufficient to support his conviction; (2) the

evidence was insufficient to support the jury's rejection of self-defense; (3) the trial court erred by rejecting Appellant's sudden passion mitigating defense; (4) the trial court erred by finding Appellant competent during trial; and (5) the trial court erred by denying Appellant's motion for mistrial based on Appellant's alleged incompetency. We modify and affirm the judgment of the trial court.

*Factual and Procedural History*

In January 2015, Appellant, his wife, Mary Lozano, and their ten-month-old son lived in the second-floor apartment of the motel Lozano managed. Dedrick Lewis, who was in Midland for work, was staying in room 203, around the corner from Appellant's apartment. Around 11:00 a.m. on January 20, 2015, a housekeeper found Lewis unresponsive in his room, and it was later determined that he died from multiple stab wounds.

Midland Police Department (MPD) Sergeant Georvarsey Mitchell described the bloody crime scene as the worst he had ever encountered. While waiting for crime scene technicians to arrive, Sergeant Mitchell noticed blood on Appellant's front door. Another officer knocked on the door and Appellant answered. Sergeant Mitchell observed blood on Appellant's hands and prosthetic leg but did not observe any wounds. Appellant "mentioned that what [officers] were looking for was in the compartment in the closet, or [o]n the roof of the . . . hotel." However, there was no compartment in the closet. Officers also observed "blood splatter" in the bathroom and "specks of blood" throughout Appellant's apartment.

Investigator Kyle Demmer and his trainee were canvasing the parking lot and noticed what looked like "a cracked eggshell" on the back of a red Dodge Charger that "had tiny specks of . . . blood splatter on it." Investigator Demmer later learned that the vehicle belonged to Lozano, who gave officers permission to search her vehicle. When the officers searched the vehicle's trunk, they found articles of

2

clothing that had blood splatter and stains on them, a backpack, a motel towel, and a large kitchen knife.

Surveillance footage showed Lewis walking up the stairs to his room at 1:57 a.m. At 2:05 a.m., Appellant walked toward Lewis's room, shirtless and carrying a white towel in one hand. Appellant and Lewis briefly interacted near Lewis's room before Appellant walked out of view several seconds later. At 2:07 a.m., Appellant walked toward Lewis's room again, but turned left down a hallway before reaching it.

According to Appellant, he and Lozano had an argument on the evening of January 19, 2015, so he went to a friend's home to drink beer. When he returned, a man he recognized approached him and told him to "be careful" of Lewis, who was drinking on the balcony. As Appellant walked up the stairway, Lewis said "he was going to put a bullet in [Appellant's] head." He approached Lewis to ask what he was "tripping over," and Lewis "immediately" started cussing at him. Appellant claimed that Lewis "was a little drunk or on drugs," and had a black handgun tucked into his belt. Appellant, "in fear for [his] life[,] . . . immediately got away from it and walked back to the apartment." He further attested to "know for a fact" that Lewis was in a gang known as the Crips.

Appellant explained that he kicked and banged on his apartment door because "[he] was in fear for [his] life." After he went back inside his apartment, he was preparing to take a shower when he heard what sounded like a young woman's scream coming from Lewis's room. Appellant stated that he "had reason to believe" the "awful scream" he heard was his eighteen-year-old daughter's voice, although she lived in Odessa at the time. Appellant was in his boxers but felt that he needed to see what was going on, so he put on his shoes to check and grabbed a kitchen knife for protection.

When Appellant went outside to investigate the screams, he decided to also take the trash from outside his apartment to the dumpster. Appellant's path took him past Lewis's room, where he was "confronted by Lewis immediately." Lewis asked Appellant, "Where do you think you're going," and he pulled Appellant into his room. Appellant described feeling in danger as Lewis pushed him and caused him to fall. Lewis then "trip[ped] over [Appellant's] feet," and "the knife . . . nicked his neck as he[] [came] down." Appellant claimed that, as they stood back up, he "poked [Lewis] a little bit . . . in the shoulder" as Lewis advanced toward him. However, Lewis continued to rush Appellant. As Lewis engaged Appellant the third time, the two of them fell but Appellant "got up first, and [he] immediately walked out of the room" and back to his apartment.

Appellant called a friend in Odessa for "help . . . handl[ing] the situation." Appellant recognized that he should have called law enforcement, but instead wrapped the knife in a towel, put it in a backpack, and left in Lozano's vehicle. But because it had less than a quarter of a tank of fuel, Appellant ran out of gas. Lozano's sister, Danita, arrived between 6:00 a.m. and 7:00 a.m. to give Appellant gas, and he returned home.

Lozano described Appellant's behavior leading up to the murder as "[r]eal anxious . . . just totally weird." Although she did not see Appellant use methamphetamine at that time, she believed that he had because his behavior was consistent with other times that he had used methamphetamine, such as saying things that did not make sense, and staying up for days at a time.

Earlier that night and prior to the murder, Lozano asked her sister, Danita, to pick her up, due to Appellant's behavior. When Danita arrived around 10:00 p.m., Appellant was reading the bible aloud to Lozano. Appellant "just turned around and said that the devil was telling him to kill [Lozano]." Danita heard Appellant say that

4

he needed to protect his family, though he did not say from what. Appellant left at Danita's request. Appellant returned home between 1:00 a.m. and 1:30 a.m., and woke Lozano up as he "banged on the door." Lozano let Appellant in then went back to bed without interacting with him. Appellant "left [again] a little while after," and then Danita heard yelling outside the apartment. Although Danita was not sure who was arguing, she believed she heard the voice of a Black man. Appellant returned to the apartment shortly thereafter, and Danita saw "something in [Appellant's] hand, but [she] couldn't tell what it was, and he just wrapped it in a towel." Danita also saw that Appellant had a towel wrapped around himself. Appellant left the apartment again. Danita denied hearing a woman scream, and testified that Appellant's daughter was not present the night of the stabbing.

Lozano did not hear from Appellant until 5:00 a.m. when he messaged her that he had ran out of gas while driving her vehicle. After Danita brought him gas, he returned to the motel, and sat in the vehicle for a while. Lozano woke Appellant up around 9:00 a.m. and he went inside the apartment.

MPD Crime Scene Investigator Rhiannon Fry processed the items in the Dodge Charger's trunk and found several blood droplets throughout. When Fry opened the backpack, she found an eight-inch kitchen knife wrapped in a towel. Fry explained that the knife was sent to a laboratory for DNA analysis. Fry additionally collected a pair of khaki shorts and shoes that both had what appeared to be blood splatter on them.

Fry also collected evidence from Appellant's apartment. Fry observed blood on the apartment's exterior door, which was collected for DNA testing. Fry identified blood splatter throughout Appellant's bathroom, some of which was swabbed for DNA testing.

5

Fry took photographs of Appellant in his apartment. Fry identified what appeared to be blood on Appellant's leg and prosthetic leg, which were swabbed for DNA testing. Fry observed some injuries on Appellant's right forearm. However, Fry did not observe any other injuries, such as to Appellant's hands. Appellant's shoes also had blood on them and were collected for DNA testing.

Reviewing room 203 and Lewis's body, Fry noted that the bottom of Lewis's shoes had a significant amount of blood on them, indicating that he was still standing while bleeding and that he stepped in the blood. According to Fry, no firearm was located in Lewis's room or on his person. Fry described an injury to Lewis's arm as a possible defensive wound, explaining that he may have put his hands up to protect his face. Fry believed the knife recovered from Lozano's vehicle was consistent with the type of knife that caused Lewis's injuries.

Tarrant County's Deputy Chief Medical Examiner Tasha Greenberg, MD, conducted an autopsy on Lewis on January 22, 2015. Dr. Greenberg explained that Lewis had a blood alcohol level of .197 grams per deciliter. Dr. Greenberg noted three injuries that she considered the most significant to Lewis: one on the left side of his face, one on his lower neck, and one to his upper chest. According to Dr. Greenberg's autopsy report, Lewis suffered nineteen stab or slash wounds throughout his body, as well as some abrasions, contusions, and lacerations. Lewis's injuries included a five-inch stab wound to the left side of his neck that injured Lewis's jugular vein, a four-inch stab wound to the right side of his neck, a six-inch stab wound to the front of his neck, a five-inch stab wound to his upper chest that injured his subclavian artery and vein, an eight-inch stab wound to the left side of his chest, and five- and six-inch stab wounds to his left torso.

Dr. Greenberg explained that the wounds on Lewis's forearm and arm could "be considered defensive or defensive-type injuries." According to Dr. Greenberg, Lewis's cause of death was "multiple stab and cutting wounds."

Brent Hester, a forensic scientist with the Department of Public Safety Crime Laboratory in Lubbock, conducted a DNA analysis of the items collected by MPD for comparison with the samples from Appellant and Lewis. Specifically, Hester tested the knife, Appellant's shoes, and swabs from Appellant's leg and bathroom faucet. According to Hester's report, the DNA on Appellant's shoes was "637 quintillion times more likely" to have come from Lewis than from an unrelated, unknown individual while Appellant was ruled out as a contributor. The DNA found on Appellant's leg was "724 quintillion times more likely" to have come from Lewis than an unrelated, unknown individual while Appellant was ruled out as a contributor. As for the knife, the DNA on the blade was "774 quintillion times more likely" to have come from Lewis than an unrelated, unknown individual, while the DNA on the handle was a mixture of two DNA profiles with "1.09 sextillion times more likely" from Lewis and "75.1 billion times more likely" from Appellant than from two unrelated, unknown individuals. Finally, the DNA found on Appellant's bathroom faucet was "804 quintillion times more likely" to have come from Lewis than an unrelated, unknown individual while Appellant was ruled out as a contributor.

Appellant was indicted for murdering Lewis by cutting and stabbing him with a knife. Prior to trial, Appellant was examined by a mental health professional and determined to be incompetent. Appellant was reexamined after a restoration program and, on June 3, 2021, the trial court found him to be competent to stand trial. Appellant's counsel subsequently requested that Appellant be reevaluated

for competency and, on September 23, 2022, Appellant was again found to be competent. A jury trial began on November 14, 2022.

In addition to presenting the testimony of law enforcement and lay witnesses, the State designated Doctor Roddy Marlene Strobel as an expert in psychiatry and determination of competency. Dr. Strobel interviewed Appellant on August 3, 2021, during which she spoke with Appellant in detail about the events around Lewis's death. Appellant testified that as he drove Lozano's vehicle to Odessa, an early 1990s model single cab pickup with two Black men and a woman, who Appellant told Dr. Strobel may have been his daughter, were following him. Appellant drove as fast as ninety miles per hour to escape. Appellant never told Dr. Strobel that Lewis pointed a gun at him.

*The Evidence is Sufficient to Support Appellant's Conviction*

Appellant's first and second issues are, according to his brief, "nearly identical" challenges to the jury's rejection of his self-defense claim. As such, we consider them together.

A. *Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018); *Brooks*, 323 S.W.3d at 895; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). As such, we must defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. The *Jackson* standard is deferential and accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we determine whether the necessary inferences are based on the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clement v. State*, 248 S.W.3d 791, 796 (Tex. App.—Fort Worth 2008, no pet.). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778. As the factfinder, the jury is "entitled to believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because [it] has the opportunity to observe the witness's demeanor and appearance." *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).

The evidence need not directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Carrizales v. State*,

414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the defendant's conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we treat direct and circumstantial evidence equally, and we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13. "Mental states are almost always inferred from acts and words" and "generally must be inferred from the circumstances under which a prohibited act or omission occurs." *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998) (quoting *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991)).

Self-defense is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected a defendant's self-defense theory. *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). For self-defense claims, the defendant has the burden of producing some evidence to support the claim. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *see also Saxton*, 804 S.W.2d at 913–14 (contrasting self-defense from affirmative defenses and explaining how burdens shift for self-defense). If the defendant produces some evidence, the State has "the burden of persuasion to disprove the raised defense." *Zuliani*, 97 S.W.3d at 594. The State's burden does not require the production of any additional evidence; instead, "it requires only that the State prove its case beyond a reasonable doubt." *Id.*; *see Saxton*, 804 S.W.2d at 913. "Because the State bears the burden of persuasion to disprove" a claim of self-defense "by establishing its case beyond a reasonable doubt, we review both legal and factual sufficiency

10

challenges to the jury's rejection of such a defense under" the legal sufficiency standard. *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

A person commits murder if he intentionally or knowingly causes the death of another. PENAL § 19.02(b)(1). "A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2021). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a) (West 2019). "A person is justified in using deadly force against another: (1) if the actor would be justified in using force against the other under Section 9.31; and (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary: (A) to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a).

B. *Analysis*

To find Appellant guilty of murder, there must have been sufficient evidence that he intentionally or knowingly caused Lewis's death without legal justification. *See* PENAL § 19.02(b)(1).

Appellant does not dispute that he intentionally or knowingly caused Lewis's death. Rather, he argues that "the only evidence that the State produce[d] [was] that there was an altercation initiated by the victim after displaying a firearm during a drunken, threatening rant." Appellant admitted that he stabbed or cut Lewis an unknown number of times, and Dr. Greenberg's report showed that Lewis was

11

stabbed or cut nineteen times, including several deep stab wounds to critical and life-threatening areas. Dr. Greenberg concluded that Lewis's stab and cutting wounds caused his death. The knife Appellant used was found in Lozano's vehicle that Appellant drove shortly after the incident, and the knife contained the probable DNA for Appellant and Lewis. Moreover, Appellant, Appellant's clothing, and Appellant's apartment contained Lewis's blood and DNA on them.

The only evidence supporting Appellant's theory of self-defense came from his own testimony, which the jury was free to disbelieve. *See Valtierra*, 310 S.W.3d 447; *see also Muhammad v. State*, No. 11-17-00328-CR, 2020 WL 3127345 (Tex. App.—Eastland June 11, 2020, no pet.) (mem. op., not designated for publication) (noting that Appellant's self-defense claim was inherently a credibility question for the jury to resolve where the only evidence of self-defense came from Appellant).

As set forth above, much of Appellant's testimony was contradicted by other evidence. For example, Appellant initially only testified to causing two of Lewis's wounds: a "nick" on his neck and a "poke" to his shoulder, while Dr. Greenberg's report demonstrated significantly more injuries to a much more serious degree. Moreover, while Appellant had only a few minor injuries, Dr. Greenberg testified that multiple injuries sustained by Lewis appeared to be defensive in nature. Appellant testified to hearing a young woman scream. To the contrary, Danita testified that she heard two men arguing but specifically denied hearing a young woman scream. Appellant testified that the scream was from his own eighteen-year-old daughter when there was no evidence of Appellant's daughter ever being present in Lewis's apartment.

Finally, Appellant's actions after Lewis's death, such as flight, failing to render aid, failing to call law enforcement, and taking steps to hide evidence, belie his claim. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (noting

that a factfinder may draw an inference of guilt from the circumstance of flight); *Patterson v. State*, 606 S.W.3d 3, 27 (Tex. App.—Corpus Christi–Edinburg 2020, pet. ref'd) (looking to appellant's post-murder conduct in assessing the sufficiency of the evidence supporting guilt); *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.— Fort Worth 2014, pet. ref'd) (referencing flight from the scene of a crime as evidence a jury could consider in rejecting a self-defense claim). Accordingly, we conclude there was legally sufficient evidence to support the jury's finding that Appellant knowingly or intentionally caused Lewis's death and the jury's rejection of Appellant's claim of self-defense beyond a reasonable doubt. *See* PENAL § 19.02(b)(1); *Brooks*, 323 S.W.3d at 899; *Moore*, 969 S.W.2d at 10; *Smith*, 355 S.W.3d at 145. Appellant's first and second issues are overruled.

*The Trial Court Did Not Err by Rejecting Appellant's Sudden Passion Defense*

By his third issue, Appellant argues that the trial court—whom Appellant elected to assess his punishment—abused its discretion by failing to find that Appellant acted under the influence of sudden passion. Appellant relies on the same facts as his self-defense claim to support his sudden-passion claim.

A. *Standard of Review & Applicable Law*

At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death of a person while under the immediate influence of sudden passion arising from an adequate cause. PENAL § 19.02(d). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is reduced to a felony of the second degree. *Id.* "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or

13

terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

We have previously observed that "the burden of production and persuasion with respect to the issue of sudden passion" is upon the defendant. *Herrera v. State*, 676 S.W.3d 896, 905 (Tex. App.—Eastland 2023, no pet.) (quoting *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013); *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005)). The issue of sudden passion is akin to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence. *See Matlock v. State*, 392 S.W.3d 662, 667 & n.14 (Tex. Crim. App. 2013); *Bullock v. State*, 673 S.W.3d 758, 764 (Tex. App.—Dallas 2023, no pet.); *Bradshaw v. State*, 244 S.W.3d 490, 502 (Tex. App.—Texarkana 2007, pet. ref'd). As such, sudden passion may be evaluated for legal and factual sufficiency, even after the Court of Criminal Appeals issued its opinion in *Brooks*. *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015); *Matlock*, 392 S.W.3d at 669–70.

In a legal sufficiency review of an affirmative defense, reviewing courts should first examine the record for a scintilla of evidence favorable to the factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not. *Butcher*, 454 S.W.3d at 20; *Matlock*, 392 S.W.3d at 669–70. The factfinder's rejection of a defendant's affirmative defense should be overturned for lack of legal sufficiency only if the appealing party establishes that the evidence conclusively proves his affirmative defense and that "no reasonable [factfinder] was free to think otherwise." *Butcher*, 454 S.W.3d at 20 (alteration in original) (quoting *Matlock*, 392 S.W.3d at 670).

In a factual sufficiency review of a finding rejecting an affirmative defense, courts examine all of the evidence in a neutral light. *Id.*; *Matlock*, 392 S.W.3d at 671. A finding rejecting a defendant's affirmative defense cannot be overturned

14

unless, after setting out the relevant evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Butcher*, 454 S.W.3d at 20; *Matlock*, 392 S.W.3d at 671.

B. *Analysis*

Appellant argues that he was under the influence of sudden passion when he stabbed Lewis based on Lewis's threats, hearing screams of a young woman in distress, and Lewis attacking Appellant. The trial court, as the factfinder, was free to disbelieve Appellant's version of events surrounding the stabbing. *See Valtierra*, 310 S.W.3d at 447; *Butcher*, 454 S.W.3d at 20; *Matlock*, 392 S.W.3d at 669–70. Moreover, even if the trial court believed that Lewis threatened Appellant during their initial encounter, Appellant walked away from the conflict. The trial court could have thus reasonably determined that Appellant was not overcome by "anger, rage, resentment, or terror" such that he was "incapable of cool reflection." *See* PENAL § 19.02(a)(1).

Similarly, the trial court was free to disbelieve Appellant's unsubstantiated claim that he heard a woman screaming, particularly in light of Lozano's testimony regarding Appellant's behavior being consistent with his known use of methamphetamine and his statement to Dr. Strobel that the occupants of the mystery vehicle following him included his daughter. Appellant went to Lewis's apartment with knife already in hand even though he did not testify that he believed Lewis was responsible for the alleged screams. Further, there was no evidence that when he returned to Lewis's apartment that *any* woman was ever there or was in distress. The evidence does not support that either the claimed initial threat or the alleged scream *provoked* Appellant to attack Lewis. *See id.*; *Butcher*, 454 S.W.3d at 20. Therefore, upon review of the evidence in the record, we cannot say that Appellant's proof of

sudden passion was such that "no reasonable [factfinder] was free to think otherwise." *See Butcher*, 454 S.W.3d at 20 (alteration in original) (quoting *Matlock*, 392 S.W.3d at 670).

Finally, we note that even had the trial court affirmatively found sudden passion, it would not have precluded the trial court from considering a punishment of life imprisonment. Although a sudden passion finding reduces the punishment range for murder from that of a first-degree felony to that of a second-degree, Appellant's punishment was nonetheless enhanced by a prior conviction, which would have made him eligible for a first-degree punishment, including life imprisonment. *See* PENAL § 19.02(d), § 12.42(b); *Segovia v. State*, 467 S.W.3d 545, 558 (Tex. App.—San Antonio 2015, pet. ref'd) (concluding the trial court did not err by denying jury instruction on sudden passion where defendant would have been ineligible to receive its benefit based on punishment enhancements for prior convictions). Accordingly, Appellant's third issue is overruled.

*The Trial Court Did Not Err When It Found Appellant Competent*

Appellant's fourth issue argues that the trial court abused its discretion by concluding Appellant was competent or, alternatively, by failing to pause the proceedings for a formal competency review. In support of his argument, Appellant points to his psychiatric history and "delusions [that] were included as the basis of [his] testimony."

A. *Applicable Facts*

Following a break in Appellant's testimony, Appellant's counsel moved for a mistrial. According to Appellant's counsel, Appellant's testimony "[went] into the areas of . . . competency and the issues that were of concern . . . about fixed delusions, fixed thoughts." Appellant's counsel explained that the "things that [Appellant] has mentioned . . . are in line with the competency issues that we've had on and

16

off throughout a long period of time." The State responded that several qualified experts had determined that Appellant was competent to stand trial, including as late as June 2022.

The trial court conducted an informal inquiry into Appellant's competency. During the inquiry, Appellant correctly identified the offense with which he was charged, the punishment range, and what had occurred in the trial so far. Appellant told the trial court that he understood the proceedings and the questions that had been asked. Additionally, Appellant expressed dissatisfaction at his attorney's suggestion of incompetency and the delays leading to trial. Moreover, Appellant suggested that his attorneys should have objected more and cross examined the witnesses "better." Importantly, Appellant indicated that he had made recommendations to his attorneys. At the end of the informal inquiry, Appellant's counsel "concede[d] that [Appellant's] responses to [the questions] certainly indicate[d] a very good understanding of what's been taking place." However, Appellant's counsel reiterated that Appellant's testimony indicated some "fixed delusions" that have impacted Appellant's recollection of the events surrounding Lewis's death. The trial court concluded that there was "no evidence suggestive of incompetency" and denied the motion for mistrial.

B. *Standard of Review & Applicable Law*

A defendant's due process rights are violated when he is tried and convicted while he is mentally incompetent to stand trial. *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Boyett v. State*, 545 S.W.3d 556, 563 (Tex. Crim. App. 2018); *Turner v. State*, 422 S.W.3d 676, 688–89 (Tex. Crim. App. 2013). Generally, a defendant is presumed to be competent to stand trial unless proven otherwise by a preponderance of the evidence. TEX. CODE CRIM. PROC. ANN. art. 46B.003(b) (West 2018). If, however, a defendant does not have (1) "sufficient present ability to consult with

[his] lawyer with a reasonable degree of rational understanding," or (2) "a rational as well as factual understanding of the proceedings against [him]," he is considered to be incompetent to stand trial. *Id.* art. 46B.003(a).

A trial court must employ a two-step process in making competency determinations before it may ultimately conclude that a defendant is incompetent to stand trial. *Boyett*, 545 S.W.3d at 563. The first step is an informal inquiry; the second step is a formal competency trial. *Id.* An informal inquiry is required when a "suggestion" is presented from any credible source that the defendant may be incompetent to stand trial. *Id.* (citing CRIM. PROC. art. 46B.004(a), (c), (c-1)). During the informal inquiry, there must be "some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." CRIM PROC. art. 46B.004(c); *Boyett*, 545 S.W.3d at 563. The Court of Criminal Appeals has described this standard as requiring "more than none or a scintilla" of evidence that "rationally may lead to a conclusion of incompetency." *Boyett*, 545 S.W.3d at 563–64 (citing *Turner*, 422 S.W.3d at 692). If the trial court determines at the informal inquiry stage that "some evidence" of incompetency exists, it must then order that the defendant submit to a psychological or psychiatric examination and, except for certain exceptions, later proceed to a formal competency trial. *Id.* (citing CRIM. PROC. arts. 46B.005(a), (b), 46B.021(b)). At the informal inquiry stage, "the standard for requiring a formal competency trial is not a particularly onerous one." *Id.* at 564.

The trial court is not required to follow any specific protocols in conducting the informal inquiry. *George v. State*, 446 S.W.3d 490, 501 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). During the informal inquiry, the trial court "must consider only evidence of incompetency, and it must not weigh evidence of competency against evidence of incompetency." *Boyett*, 545 S.W.3d at 564. Thus,

in making this initial determination, "[the] trial court must consider only [the] evidence [that tends] to show incompetency" and disregard "all competing indications of competency." *Id.* (quoting *Turner*, 422 S.W.3d at 692). "[S]ome evidence must be presented at the informal inquiry stage to show that a defendant's mental illness is the source of his inability to participate in his own defense." *Id.* Thus, there must be:

> some evidence from which it may rationally be inferred *not only* (1) that the defendant suffers from some degree of [a] debilitating mental illness, and that (2) he obstinately refuses to cooperate with counsel to his own apparent detriment, *but also* that (3) his mental illness is what fuels his obstinacy.

*Id.* (quoting *Turner*, 422 S.W.3d at 696). It is not enough to present evidence of a defendant's mental illness alone or his refusal to cooperate with trial counsel—rather, there must be "some evidence" that indicates that the defendant's mental illness is the reason why he refused to rationally engage with his trial counsel. *Id.* "Should the formal competency trial result in a finding of competency, the trial court is not obliged to revisit the issue later absent a material change of circumstances suggesting that the defendant's mental status has deteriorated." *Turner*, 422 S.W.3d at 693.

Because the trial court can observe the defendant's mannerisms and behaviors, it is in a better position to determine whether a defendant is competent to stand trial. *McDaniel v. State*, 98 S.W.3d 704, 713 (Tex. Crim. App. 2003) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We therefore review challenges to the adequacy of the trial court's informal competency inquiry, its findings and determinations following its informal inquiry, and its decision whether to order a formal competency examination, for an abuse of discretion. *George*, 446 S.W.3d at 499 (citing *Luna v. State*, 268 S.W.3d 594, 600 (Tex. Crim. App. 2008));

19

*Goswick v. State*, No. 11-16-00164-CR, 2017 WL 2986841, at *2 (Tex. App.—Eastland July 13, 2017, no pet.) (mem. op., not designated for publication). We do not substitute our judgment for that of the trial court; instead, we determine whether the trial court's decision was unreasonable. *Goswick*, 2017 WL 2986841, at *2. A trial court does not abuse its discretion absent a showing that its decision was arbitrary or unreasonable and we must afford great deference to a trial court's factual findings of a defendant's ability to understand the nature of the proceedings pending against him and to assist trial counsel in his defense. *McDaniel*, 98 S.W.3d at 713.

C. *Analysis*

Appellant's counsel did not identify which portion of Appellant's testimony he believed to demonstrate Appellant's "fixed delusions" at trial. Similarly, on appeal, Appellant does not direct us to which statements or testimony represent Appellant's "fixed delusions." Although Appellant had previously been found incompetent, he had since been found competent on two occasions prior to trial, including less than two months before his trial began. Thus, the trial court was not obligated to revisit the matter "absent a material change of circumstances suggesting that the defendant's mental status has deteriorated." *See Turner*, 422 S.W.3d at 693. The trial court nonetheless conducted an informal inquiry into Appellant's competency. *See Boyett*, 545 S.W.3d at 563. During the informal hearing, Appellant demonstrated that he had an adequate grasp regarding the charges against him and the trial proceedings. We agree with the trial court that the record contains "no evidence suggestive of incompetency"—nothing indicated that Appellant suffered from a debilitating mental illness or that he obstinately refused to cooperate with his counsel. *See Boyett*, 545 S.W.3d at 564. Accordingly, we conclude that the trial court did not abuse its discretion by declining a formal competency trial or by finding

20

Appellant to be competent. *See George*, 446 S.W.3d at 499. Appellant's fourth issue is overruled.

*The Trial Court Did Not Err by Denying Appellant's Motion for Mistrial*

In Appellant's fifth issue, he argues that the trial court erred by denying his motion for mistrial predicated on his incompetency. Appellant relies on the same facts that he argued supported his challenge to the trial court's finding of competency.

A. *Standard of Review & Applicable Law*

A trial court's ruling on a motion for mistrial is reviewed for an abuse of discretion. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). "A mistrial is a remedy of last resort." *See Berkley v. State*, 298 S.W.3d 712, 714 (Tex. App.—San Antonio 2009, pet. ref'd). A mistrial is proper when used to halt trial proceedings because an error is so prejudicial that it is incurable—making an impartial verdict impossible—or when a verdict would have to be reversed on appeal due to obvious procedural error. *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). "The determination of whether a given error necessitates a mistrial must be made by examining the particular facts of the case." *Weinn v. State*, 281 S.W.3d 633, 642 (Tex. App.—Amarillo 2009), *aff'd*, 326 S.W.3d 189 (Tex. Crim. App. 2010).

B. *Analysis*

Appellant's sole argument supporting his motion for mistrial rests upon a conclusion that Appellant was incompetent during trial. Because we have concluded the trial court did not err by finding Appellant competent, we likewise conclude the trial court did not err by denying Appellant's motion for mistrial on the same basis. *See Wood*, 18 S.W.3d at 648; *Weinn*, 281 S.W.3d at 642. Appellant's fifth issue is overruled.

*Modification of the Judgment*

As an appellate court, we have the power and an obligation to modify the judgment of the trial court to make the record speak the truth if the matter comes to our attention in any manner and if we have the necessary information to do so. *See* TEX. R. APP. P. 43.2(b); *see also French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). The authority of an appellate court to reform incorrect judgments is not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court. *See* TEX. R. APP. P. 43.2(b); *French*, 830 S.W.2d at 609; *Asberry*, 813 S.W.2d at 529–30; *see also Carmona v. State*, 610 S.W.3d 611, 618 (Tex. App.—Houston [14th Dist.] 2020, no pet.). Accordingly, we modify the trial court's judgment to reflect that the trial court, not the jury, assessed Appellant's punishment. *See* TEX. R. APP. P. 43.2(b).

*This Court's Ruling*

As modified, we affirm the judgment of the trial court.


W. BRUCE WILLIAMS
JUSTICE


October 17, 2024

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.